Filed 2/22/21  In re L.L. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re L.L. et al., Persons Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JENNA L., <br><br> Defendant and Appellant. | F081371 <br><br> (Super. Ct. Nos. 20JP-00004-A & B) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Nicholas J. Mazanec, under appointment by the Court of Appeal, for Defendant and Appellant.

Forrest W. Hansen, County Counsel, and Jennifer Trimble, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Jenna L. (mother) appeals from the juvenile court's findings and orders made at the conclusion of the jurisdiction and disposition hearing concerning her two sons, now 15-year-old L.L. and 12-year-old S.L., whose respective fathers are W.T. and J.L.  After the juvenile court removed both sons from mother's custody, it granted mother

reunification services with respect to S.L., and placed L.L. in his father's custody while retaining limited jurisdiction for the purpose of reviewing his placement in three months, as provided in Welfare and Institutions Code section 361.2, subdivision (b)(2).[1]  While mother was granted visitation with her sons, the juvenile court gave them discretion to opt out of visits.

On appeal, mother contends:  (1) the visitation order impermissibly delegates to her children the authority to determine whether any visits will occur; and (2) the juvenile court erred by failing to comply with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).  We agree with mother's first contention and reverse the visitation order as to S.L., but otherwise affirm the juvenile court's orders.

### FACTUAL AND PROCEDURAL BACKGROUND

Then 14-year-old L.L. and 11-year-old S.L. were placed in protective custody on January 8, 2020, after the Child Welfare Services of Merced County Human Services Agency (Agency) completed an investigation into three referrals alleging mother was physically abusing them.  The Agency filed a dependency petition alleging the boys came within the provisions of section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect) and (c) (serious emotional damage).  The petition alleged multiple incidents of excessive physical discipline by mother, including hitting her sons with a cord, belt, belt buckle, paddle and her fist.  Mother forced the boys to take Epsom salt baths to prevent bruising and used creams and oils to heal any marks or bruises.  The petition further alleged both fathers, who admitted being aware of the excessive physical discipline, failed to protect the boys from it.  The boys were alleged to have suffered serious emotional damage as a result of the excessive discipline.

***The Detention Hearing***

At the January 13, 2020 detention hearing, the juvenile court elevated both fathers to presumed father status and conducted an inquiry into Native American ancestry.  The

---

[1]	Undesignated statutory references are to the Welfare and Institutions Code.

2.

Agency had completed an "Indian Child Inquiry Attachment" (unnecessary capitalization omitted) form (ICWA-010(A)) for each boy. L.L.'s form stated he may have Indian ancestry; while mother stated she did not have any Native American heritage, W.T. reported L.L.'s paternal grandfather told him "years ago" that he may have "a small percentage Cherokee, but not enough." S.L.'s form stated he had no known Indian ancestry, as both mother and J.L. denied having any Native American heritage.

The juvenile court confirmed mother did not believe she had any Indian heritage and W.T. was saying he thought he had some Cherokee Indian heritage on his father's side, but not enough to be on any membership roll. No one had followed up on paternal grandfather's claim that W.T. might have some Cherokee heritage. The juvenile court confirmed paternal grandfather was still alive and said it would have both parents fill out a "Parental Notification of Indian Status" (unnecessary capitalization omitted) form (ICWA-020). The juvenile court further stated it was "[p]robably appropriate" to have W.T. fill out the "Notice of Child Custody Proceedings" (unnecessary capitalization omitted) form (ICWA-030) "so the Agency can follow up and make sure that we don't miss something," because even if there were a small percentage, they "should give notice to the appropriate Indian tribe so they can make that determination whether they have any involvement in the case or not. We'll have you fill out an ICWA 30 form." According to the minute order of the hearing, the juvenile court reserved ICWA findings as to all parents, mother was provided with an ICWA-030 form and the Agency was to provide the ICWA-030 form to W.T., who appeared at the hearing telephonically because he lived in Oklahoma.

The detention hearing was continued to the following day, as S.L.'s father wanted a contested hearing. At the continued hearing, the juvenile court stated it received information that S.L.'s father passed away the day before. The juvenile court found a prima facie case and placed the boys in the Agency's care.

### *The Jurisdiction and Disposition Reports*

In the jurisdiction report, the Agency recommended the juvenile court take jurisdiction of the boys pursuant to section 300, subdivisions (a), (b) and (c). The boys were placed with a relative. The report stated ICWA may or may not apply. While mother and S.L.'s father told the social worker they did not have Native American heritage, L.L.'s father told the social worker he had heard about possible Cherokee in his family, but he did not have "enough" for tribal membership.[2] After that, W.T. filled out an ICWA-020 form stating he did not have any Indian ancestry. W.T. was provided with an ICWA-030 form on January 15, 2020.

The report recounted the history of referrals to child protective services, a past case in Yolo County, and past services offered to the family on a voluntary basis, as well as reports from child protective services in Oklahoma and psychiatric hospital reports regarding S.L. Prior referrals indicated instances of the boys reporting being hit with spoons and a belt, and mother having the boys take long baths and then using essential oils and salt to help the wounds heal more quickly.

The social worker included summaries of interviews with the boys, mother, L.L.'s father, and maternal grandfather. L.L. reported he had been abused his whole life; the first abuse he remembered occurred when he was seven years old. Mother hit him with objects such as a frying pan, belts, and spoons. No one believed him when he reported the abuse and if he told anyone, mother would not let him talk to them anymore. He could not take the abuse and thought of killing himself or disappearing at school. He did not tell his father about the abuse because he was afraid he would get hurt. S.L. also reported mother hitting them. Both boys reported mother would promise them money or video games if they stayed quiet about the abuse. Mother, however, denied physically abusing the boys or forcing them to take baths. W.T. saw mother hit S.L. with a belt and

---

[2] Mother and S.L.'s father completed ICWA-020 forms, in which they checked that they did not have any Indian ancestry as far as they knew.

4.

he heard things from family, but he was unaware of the severity of the abuse because he had been kept at "arm's length" and was incarcerated a number of years.

In the disposition report, the Agency recommended mother be offered reunification services for S.L., custody of L.L. be granted to W.T., and the dependency dismissed with a custody and visitation order. The report stated ICWA did not apply to S.L., but there was "reason to believe" it may apply to L.L. On February 28, 2020, the Agency sent an ICWA-030 form to the three federally recognized Cherokee tribes for L.L via certified mail, which gave notice of the March 12, 2020 jurisdiction and disposition hearing.[3] The report stated all tribes received the ICWA-030 form, with the last tribe served on March 7, 2020. Mother had biweekly supervised visits with the boys. There were concerns she was being manipulative, as she deleted the boys' social media accounts and asked them to provide information or communicate with her in order to obtain the password to the accounts. In addition, mother attempted to reach the boys through third parties when they asked not to speak with her.

***The Jurisdiction and Disposition Hearing***

A contested jurisdiction and disposition hearing was held on June 23 and 30, 2020. The social worker testified about the events that led to the Agency's involvement, mother's response, her interviews of the boys and others involved in the case, and mother's proposed case plan. She also testified the boys' placements and events leading to a change in their placement, as well as the boys' needs.

S.L. testified his mother had abused him his whole life by hitting him with objects and she made him take baths in Epsom salts to try to reduce bruising. S.L. stopped talking to mother about two weeks before the hearing because he did not want to talk to her "right now" and he had an opportunity to visit mother the day of the hearing, but he told them no and he was not open to visiting her later that day. S.L. ended his testimony

---

[3]     The Agency also sent the Cherokee tribes an ICWA-030 form for S.L., even though his parents denied any Native American heritage.

by sharing a text he sent mother stating he did not want to live with her, but he was willing to work on their relationship if she did not "try to mess things up for me" by fighting with him or stopping him from moving on with his life.

L.L. testified mother abused him his entire life by hitting him with various objects and made him take salt baths to make the bruises heal faster. Nothing in the world would make him go back to mother because he did not want to live with someone who would hurt him. L.L. wanted to live with his father.

W.T. testified about his criminal history, wife and stepchildren, housing, sobriety, his son's visits in Oklahoma, and his willingness to work with mother to arrange visitation. He was not aware of the abuse and he agreed with the Agency's recommendation to have his son placed with him. After the conclusion of the first day of the contested hearing, the juvenile court allowed L.L. to be placed with his father, finding it would be in L.L.'s best interest and there was no detriment. The Agency agreed to attempt to arrange a visit between L.L and mother before he left California.

At the continued hearing on June 30, 2020, mother's attorney recalled the social worker, who was questioned about the boys' educational needs and individualized education plans (IEP). Mother also called Wendy Westsmith, the director of services who oversees special education for the school district. She testified about the boys' IEPs, the assessments, and mother's active participation in the IEP process, including providing information when requested. Mother's counselor, Rhonda Kinser, testified about mother's background and her telephone sessions with mother. Kinser testified to mother's progress in their sessions, her willingness to work with Kinser to manage conflicts, the improvement of her self-confidence and recognition of the appropriate sharing of information with the boys.

Mother testified and continually denied physically abusing her sons, although she admitted spanking them with her open hand and hitting them with a belt. She also denied having the boys take salt baths to reduce swelling or bruising or using oils on them. She

6.

testified about the boys' educational history, her advocacy for services to meet their needs, and their psychological, behavioral, and medical histories. She expressed her concerns with the boys being placed with W.T. and relatives, and explained the classes and services she voluntarily engaged in. Mother wanted to reunify with both boys and asked that they be returned to her.

Following argument by counsel, the juvenile court stated the boys "gave very powerful testimony" which it found to be "very credible," while mother's testimony was "overly justified" at times. The juvenile court was troubled mother did not have the capacity to describe a clear understanding of what her sons were suffering. The juvenile court took jurisdiction and found the boys were persons falling within section 300, subdivisions (a), (b) and (c).

With respect to S.L., the juvenile court removed him from mother's custody and ordered reunification services. The juvenile court ordered once monthly supervised visits between S.L. and mother, which may include video, audio or other means of communication, and ordered supervised sibling visits, which the social worker would coordinate with L.L.'s father. The juvenile court gave the Agency discretion to expand or limit S.L.'s visits with mother and L.L., considering S.L.'s best interests, and if visits were not occurring, the court would review the concerns. The juvenile court allowed mother to retain her educational rights. The juvenile court set a six-month review hearing for August 27, 2020.

S.L.'s attorney then asked that S.L. "be able to opt out" of visits with mother, but they should "keep a close, close tab on that," as it was not necessarily in S.L.'s best interests to get to a point where he was never speaking to mother again. The juvenile court agreed, stating it would include in the order that S.L. "is of sufficient age and ability to make the determination that if he wishes not to have contact he can opt out," but

they needed to "keep a close tab on that" because if it was abused or misused it would undermine reunification.[4]

With respect to L.L., the juvenile court had reservations about dismissing jurisdiction because it wanted to ensure L.L. would receive services. County counsel asked the juvenile court, if it was not inclined to terminate jurisdiction, to proceed under section 361.2, subdivision (b)(2), which would allow W.T. to assume custody but required a home visit within three months, so the Agency could be involved and ascertain whether L.L. was getting the services he needed. Mother's attorney requested joint legal custody and her visits with L.L. be unsupervised, but if it was supervised, asked that W.T.'s sister supervise them.

The juvenile court adopted county counsel's suggestion, removed L.L. from mother's custody, placed him with his father under section 361.2, subdivision (b)(2), and ordered a home visit to occur within three months to determine whether his father was meeting his needs. The juvenile court stated it was giving W.T. sole legal custody of L.L. and it believed L.L. "should have the ability to have visitation or contact with his mother, either supervised or unsupervised, given his age, at his discretion, including the opportunity to opt out if he chooses not have contact."[5] The juvenile court set a hearing for August 27, 2020, to determine whether the custody order needed to be adjusted and whether it would be safe to terminate jurisdiction.

The juvenile court subsequently signed a custody order which gave W.T. sole legal and physical custody of L.L. The attached visitation order granted mother visitation

---

[4]     The minute order of the hearing states visitation will be at least once a month, but S.L. "may opt out of the visits." S.L.'s written visitation order issued after the hearing provides that the social worker will arrange visitation with mother no less than once a month, "as recommended and in the best interest" of S.L., but S.L. "may opt out of visitation," and the social worker is authorized to expand visitation to include supervision by others as well as unsupervised visitation.

[5]     The minute order of the hearing states that visitation with L.L. will "be at least once a month and will be at the discretion of the minor."

at least twice a month, to be supervised through a third party in Oklahoma at mother's expense, although "[v]isits may be supervised, or unsupervised, at [L.L.]'s discretion." The visitation order further stated: "Visits are to take place when it is in the best interest of the minor, L[.]L[.]" at mother's expense.

## DISCUSSION

### I.    The Visitation Orders

Mother contends the juvenile court abused its discretion when it allowed S.L. the ability to "opt out" of visits and L.L. to have "discretion" over whether visits occurred. The Agency asserts mother forfeited this claim by failing to object to the visitation order and, in any event, it would not be in the boys' best interests to force them to visit mother and they were not given the power to veto visitation altogether.

"The superior court, sitting in dependency cases … has the power and responsibility to regulate visitation between dependent children and their parents." (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476.) "Visitation is a necessary and integral component of any reunification plan." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*S.H.*).) The juvenile court cannot delegate the power to order visitation to child protective services, a social worker, a counselor, the children's caretaker, or even the children themselves. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 49 (*Julie M.*).) In ordering visitation, the juvenile court may vest limited discretion with the supervising agency to consider the children's desires regarding visits with a parent. (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237.) While " '[a] visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner[,] … "the ultimate supervision and control over this discretion must remain with the court…." ' " (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 517.) We review the juvenile court's order setting visitation terms for abuse of discretion. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

9.

We first address as a threshold matter the Agency's contention mother forfeited this argument by failing to raise it before the juvenile court. Mother responds that while her attorney did not use the word "objection," it was clear from her attorney's arguments she did not agree with the proposed visitation orders. Mother's attorney asked the juvenile court to consider family maintenance and in discussing L.L.'s proposed custody order, which called for only supervised visitation, her attorney stated it seemed like L.L. and mother "should be able to talk, if it's appropriate and L[.L.] wants to talk," and if visits were supervised, a relative could do it. Asking the court to consider family maintenance or to allow for unsupervised visits, however, is not an objection to visitation orders allowing the boys to opt out of visits.

Although we agree mother forfeited the issue by failing to raise it in the juvenile court, at mother's request, we will exercise our discretion to consider the visitation orders as a determination on the validity of the orders would add certainty and stability to the boys' visitation. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [discretion to consider forfeited claims should be exercised with special care in dependency cases; "considerations such as permanency and stability are of paramount importance"].)

*S.H.* is instructive on the visitation issue. There, the juvenile court ordered monitored visitation, but because the children feared their mother and refused visits during their initial detention, the visitation order specified, " 'if the children refuse a visit, then they shall not be forced to have a visit.' " (*S.H.*, *supra*, 111 Cal.App.4th at pp. 313, 316.) The appellate court held the order was invalid because it "impermissibly delegate[d] to [the] children the authority to determine whether any visits will occur." (*Id.* at p. 313.) The appellate court acknowledged the order "affirmatively determine[d]" mother's right to visitation "rather than making [it] entirely contingent on the child's consent" (*id.* at p. 318), and the juvenile court made additional orders designed to encourage visitation, including ordering counseling for the children and for their mother (*id.* at pp. 318–319). Nevertheless, the appellate court concluded that "by failing to

10.

mandate any minimum number of monitored visits per month or even to order that *some* visitation *must* occur each month, the [juvenile] court's abstract recognition of [the mother's] right to visitation [was] illusory, transforming the children's ability to refuse 'a visit' into the practical ability to forestall any visits at all." (*Id.* at p. 319.)**6**

We conclude the visitation order as to S.L. similarly placed the sole discretion as to whether any visitation would occur in his hands. As in *S.H.*, the juvenile court here affirmatively acknowledged mother's right to visitation. Moreover, the juvenile court stated at the hearing it did not want S.L.'s right to refuse visits to be abused or misused. The written visitation order specifies the social worker will arrange visits "no less than one time monthly, as recommended and in the best interest" of S.L, and that visits are to be held at the Agency or other approve location, which may include visits via Skype or other modes of communication.

Like the order in *S.H.*, however, the visitation order here did not mandate any minimum number of supervised visits per month or otherwise order some visitation to take place. (*S.H.*, *supra*, 111 Cal.App.4th at p. 319.) Rather, the court ordered that S.L. "may opt out of visitation." Accordingly, the order essentially granted S.L. total discretion to determine whether visits would take place at all. While it is true, as the Agency asserts, that if S.L. opted out of a visit another would be scheduled the following month, by giving S.L. the ability to refuse a visit without ensuring a minimum number of visits actually took place, the juvenile court effectively gave S.L. the power to veto them.

We agree S.L's wishes must be considered, particularly given his age and his fraught relationship with mother and his hesitancy to visit her. Nevertheless, "while the juvenile court may allow the child to refuse to attend a particular visit, to prevent the child from exercising a de facto veto power, there must be some assurance that, should

---

**6** Similarly, the appellate court in *Julie M.* held that a visitation order that gave the children "the option to consent to, or refuse, any future visits with their mother" was invalid because it essentially delegated judicial power to the children. (*Julie M.*, *supra*, 69 Cal.App.4th at pp. 46, 48–49.)

that occur, another visit will be scheduled and actually take place." (*S.H.*, *supra*, 111 Cal.App.4th at p. 319.) As the court in *S.H.* so aptly stated, "In no event, however, may the child's wishes be the *sole* factor in determining whether any visitation takes place, either as a formal matter or, as occurred in the case now before us, by effectively giving the children the power to veto all visits." (*Ibid.*)

Here, S.L.'s wishes were the *sole* factor in determining whether supervised visits with mother would occur, making her right to visitation essentially illusory. Neither the Agency nor mother had any way of ensuring visits would take place, such as by rescheduling missed visits S.L. decided not to attend. We therefore conclude the juvenile court abused its discretion by giving S.L. the ability to "opt out" of visits, without ensuring that missed visits took place.

With respect to L.L., the juvenile court similarly stated on the record that it believed L.L. should have discretion to determine whether visits with mother should be supervised or unsupervised, as mother's attorney requested, "including the opportunity to opt out if he chooses not to have contact." Giving L.L. the ability to opt out of visits without ensuring a minimum number occurred would be improper for the same reasons set forth above. The written visitation order, however, does not contain any such provision; nowhere does it give L.L. discretion to determine whether visits occur at all. To the extent that the juvenile court's oral pronouncement differed from its written order, the written order controls. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756, fn. 1.) In that case, the visitation order as to L.L. is not improper.

Accordingly, we reverse the visitation order as to S.L. and remand for a hearing on visitation as to him only. Our decision does not preclude the juvenile court from ordering S.L.'s wishes be considered with respect to scheduling visits with mother, nor should it be read to force him to visit her. We hold only, as courts have held before us, that his wishes are not the *sole* factor in determining whether any visitation takes place. (E.g., *S.H.*, *supra*, 111 Cal.App.4th at p. 319; *Julie M.*, *supra*, 69 Cal.App.4th at pp. 50–51

12.

[child's "aversion to visiting an abusive parent may be a 'dominant' factor in administering visitation" but not "the *sole* factor"], citing *In re Danielle W.*, *supra*, 207 Cal.App.3d at p. 1237.)

## II.     ICWA

Mother contends the Agency failed to comply with ICWA's requirements because (1) the ICWA-030 form did not include information available or easily available to the Agency, namely, the current or former address for maternal grandmother, and the prior address for mother or W.T.; (2) the Agency failed to file the return receipts showing proof of notice; and (3) the record did not contain any responses from the tribes.  She asserts a limited remand is required for compliance with the notice requirements.

At the combined jurisdiction and disposition hearing, the juvenile court did not make any ICWA finding or final ruling as to whether proper notice had been completed and ICWA applied to the proceedings with respect to L.L.  On this basis, we asked the parties to address whether mother's appellate arguments are premature, citing *In re M.R.* (2017) 7 Cal.App.5th 886, 903-904.  There, the juvenile court found at the dispositional hearing that ICWA noticing had been initiated and ICWA may apply to the children. (*In re M.R.*, at p. 904.)  In their appeal from the dispositional findings and orders, both parents challenged the adequacy of the efforts made to comply with the ICWA notice requirements.  (*In re M.R.*, at p. 903.)  The appellate court determined the dispositional ICWA finding was not a final ruling as to whether proper notice had been completed or whether ICWA applied to the proceedings; therefore, any claim of error regarding ICWA compliance was "simply premature."  Accordingly, the appellate court declined to review the adequacy of an ICWA noticing process that was still ongoing, noting it could address any claims of error, including the juvenile court's final rulings with respect to ICWA matters, in any subsequent appeal.  (*In re M.R.*, at p. 904 & fn. 9.)

In this case, the Agency initiated ICWA noticing by mailing out ICWA-030 forms to three Cherokee tribes and represented to the juvenile court that the tribes had received

the forms. The juvenile court did not make an ICWA finding at the dispositional hearing. Because the juvenile court did not make a final judgment on the adequacy of the ICWA notices, the issue is premature.

Mother asserts that by proceeding with the jurisdiction and disposition hearing without treating L.L. as an Indian child, the juvenile court implicitly found the notices were proper and ICWA did not apply. We cannot infer these findings, however, because the juvenile court could have declined to treat L.L. as an Indian child apart from finding ICWA did not apply, namely, because it did not yet have "reason to know" he was an Indian child, which essentially requires having information that establishes L.L. is an Indian child.[7] (§ 224.2, subds. (d) & (i)(1).) When there is reason to know the child is an Indian child, the juvenile court is required to treat the child as an Indian child unless and until the juvenile court reviews the Agency's due diligence efforts and copies of notices and the tribe's responses, and determines on the record the child does not meet the definition of an Indian child. (§ 224.2, subd. (i)(1).) The juvenile court may find ICWA does not apply to the proceedings if it finds the Agency conducted a "proper and adequate further inquiry" and exercised "due diligence to identify and work" with all the pertinent tribes to verify "whether the child is in fact a member or whether a biological parent is a member and the child is eligible for membership." (§ 224.2, subds. (i)(2) & (g).)

---

[7] There is "reason to know" a child is an Indian child if: "(1) A person having an interest in the child … informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding … informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child … gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [¶] [and] (6) The court is informed that either parent or the child possesses an identification card indicating membership or citizenship in an Indian Tribe." (§ 224.2, subd. (d); see 25 C.F.R. § 23.107(c) (2020).)

14.

Here, there is nothing to suggest there was reason to know at the time of the jurisdiction and disposition hearing that L.L. was an Indian child. Therefore, the juvenile court's failure to treat him as an Indian child does not mean it impliedly found ICWA did not apply. Moreover, the juvenile court did not make any findings that the Agency conducted a proper and adequate inquiry or exercised due diligence, which under section 224.2, subdivision (i)(2) it must do before it may find ICWA does not apply to the proceedings. We decline to infer that the juvenile court made such findings.

Since we cannot infer the juvenile court found ICWA did not apply and the juvenile court did not make an explicit finding, we conclude mother's ICWA contentions are premature and decline to address them in this appeal.[8]

## DISPOSITION

The portion of the July 23, 2020 order in S.L.'s case regarding mother's visitation is reversed, and S.L.'s case is remanded to the juvenile court to hold a new hearing on the issue of visitation. In all other respects, the juvenile court's orders are affirmed.

DE SANTOS, J.

WE CONCUR:

POOCHIGIAN, Acting P.J.

MEEHAN, J.

---

[8]    Because the appeal is premature, we deny the Agency's request to take judicial notice of response letters from the tribes, which were attached to the Agency's six-month status review report, and the September 3, 2020 minute order in which the juvenile court found ICWA did not apply to L.L., which are part of the appellate record in mother's subsequent appeal in case No. F082005. We note that mother may raise any claims of ICWA error in the subsequent appeal.

15.